## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**UNITED STATES OF AMERICA,**      )
)
)
)
**v.**      )      **Criminal No. 11-10223-DJC**
)
**TERRANCE MOON,**      )
)
**Defendant.**      )
)
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                             June 13, 2012

### I.    Introduction

Defendant Terrance Moon ("Moon") has been charged in a three-count indictment, filed on June 8, 2011, with possession with intent to distribute controlled substances, namely heroin and cocaine (Counts I and II), being a felon in possession of a firearm and ammunition (Count III) and possession of a firearm in furtherance of a drug trafficking crime (Count IV). D. 6.[1] All of these charges arose out of the execution of a search warrant on February 6, 2011 at 99 Ormond Street, Apartment #1 in Mattapan. The search warrant was based upon the affidavit of a Boston Police Department ("BPD") detective. That affidavit recounted that the police had received information from a confidential informant ("CI") who previously purchased heroin from an individual later identified as Moon and that the police had conducted surveillance of three controlled purchases of heroin by this CI from Moon in the "last couple of months," "the last month," and within the "last

_____

[1]References to the docket are indicated by "D. __."

seventy-two hours" before seeking the search warrant. None of these three controlled buys are charged in this case and the government does not intend to call the CI as a witness at trial.

Moon has now moved for a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) on the grounds that the affidavit supporting the search warrant contained several material misstatements and has moved to suppress the fruits of the subsequent search. D. 38 at 7-8. Moon also filed a related motion for discovery, seeking information about the affiant for the search warrant, the exact dates and times of the three controlled buys referenced in the search warrant affidavit and certain information about the CI. D. 39. The Court held a motion hearing and took both of Moon's motions under advisement. Since the Court concludes that Moon has not made the substantial preliminary showing required for a <u>Franks</u> hearing and finds that the warrant was supported by probable cause, the Court DENIES his motion for the hearing and the motion to suppress the fruits of the search. The Court also DENIES Moon's related motion for discovery.

## II.     Standard of Review and Burden of Proof

### A.     <u>Probable Cause for the Search Warrant</u>

It is well settled that there is "'a presumption of validity with respect to the affidavit supporting the search warrant.'" <u>United States v. Tzannos</u>, 460 F.3d 128, 136 (1st Cir. 2006) (quoting <u>Franks</u>, 438 U.S. at 171). Accordingly, a defendant's challenge to the probable cause for a search warrant will ordinarily be confined to the four corners of the supporting affidavit. <u>See United States v. Grant</u>, 218 F.3d 72, 75 (1st Cir. 2000). Where a defendant challenges the legality of a search conducted pursuant to a search warrant, the defendant bears the burden of showing by a preponderance of the evidence that the search was unlawful. <u>United States. v. Legault</u>, 323 F. Supp. 2d 217, 220 (D. Mass. 2004); <u>see United States v. Burdulis</u>, No. 10-40003, 2011 WL

1898941, at *3 (D. Mass. May 19, 2011) (citing cases). A "warrant application must demonstrate probable cause to believe that (1) a crime has been committed . . . and (2) enumerated evidence of the offense will be found at the place to be searched . . . ." United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005) (citation omitted). The issue for the reviewing court is whether "the totality of the circumstances" in the affidavit afforded the clerk magistrate a "substantial basis for determining the existence of probable cause" for the search. Illinois v. Gates, 462 U.S. 213, 238 (1983). A reviewing court "must examine the affidavit in a practical, commonsense fashion" and "accord considerable deference to a magistrate's determination that information in a particular affidavit establishes probable cause." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (internal quotation marks and citation omitted).

### B.    Motion for *Franks* Hearing

However, if a defendant makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and such statement "is necessary to the finding of probable cause," the Fourth Amendment requires that the Court conduct an evidentiary hearing, a so-called Franks hearing, at the defendant's request, to challenge the validity of the affidavit. Franks, 438 U.S. at 155-56. In this context, "[t]o prove reckless disregard for the truth, the defendant must prove that the affiant 'in fact entertained serious doubts as to the truth' of the allegations." United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002) (quoting United States v. Williams, 737 F.2d 594, 602 (7th Cir. 1984)). "A material omission of information may also trigger a Franks hearing." United States v. Castillo, 287 F.3d 21, 25 (1st Cir. 2002); see United States v. Cartagena, 593 F.3d 104, 112 (1st Cir. 2010). A defendant must make the requisite showing by a preponderance of the evidence and also show that

"'with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause.'" Tzannos, 460 F.3d at 136 (quoting Franks, 438 U.S. at 156). Any Franks hearing is directed to the veracity of the police officer and "cannot test the truthfulness of the Tipster (or of any private informant, for that matter)." United States v. D'Andrea, 648 F.3d 1, 13 (1st Cir. 2011).

**C.     Renewed Discovery Motion**

Although a criminal defendant has no general right to discovery, Weatherford v. Bursey, 429 U.S. 545, 559 (1977), it is well settled that a defendant is constitutionally entitled to "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment . . . ." Brady v. Maryland, 373 U.S. 83, 87 (1963); see Kyles v. Whitley, 514 U.S. 419, 433 (1995). The government is obligated to provide such exculpatory evidence, even without a request for same by the defendant. Kyles, 514 U.S. at 433; United States v. Agurs, 427 U.S. 97, 103-04 (1976). Exculpatory evidence includes evidence that casts doubt on the credibility or accuracy of any witness the government anticipates calling at trial or any evidence the government expects to proffer at trial. United States v. Bagley, 473 U.S. 667, 678 (1985); Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Neal, 36 F.3d 1190, 1196 n. 3 (1st Cir. 1994); United States v. Osorio, 929 F.2d 753, 761 (1st Cir. 1991). Moreover, Moon argues that the discovery he seeks falls under Local Rule 116.2(b)(1)(B):

> information that would cast doubt on the admissibility of evidence that the government anticipates using in its case-in-chief and that could be subject to a motion to suppress or exclude, which would, if allowed, be appealable pursuant to 18 U.S.C. § 3731.

The Local Rules require the government to produce such information to the defense within twenty-eight days or arraignment or by an alternative date set by the Court. Local Rule 116.1(c)(1),

116.2(b)(1). The same description appears in Local Rule 116.2(a) which defines exculpatory information as "information that is material and favorable to the accused and includes, but is not necessarily limited to," the type of information described above under Local Rule 116.2(b)(1)(B). Local Rule 116.2(a)(2).

## III. Factual Background

### A. Application for the Search Warrant

Except as otherwise noted, the following facts are based upon the affidavit of Boston Police Detective Michael M. Ross ("Detective Ross") submitted in support of the application for a search warrant for 99 Ormond Street, Apartment #1 in Mattapan ("the 99 Ormond Street address"). The search warrant application was submitted to the Boston Municipal Court on February 4, 2011. D. 38-1 at 1. In the supporting affidavit for the search warrant ("Ross affidavit"), Detective Ross explained that "[w]ithin the last few months," he had received information from a "Boston Police confidential informant ["CI"]"who had provided police "with reliable information in the past that has led to the arrests and convictions of individual(s) for violation of the drug laws and also the seizure of drug(s), money, firearms(s) and ammunition." Id. at 2. This CI informed Detective Ross that a black male, approximately 5'9" tall, 170-190 pounds with black hair in his forties by the name of "T" had been selling heroin in the Roxbury section of Boston. Id. The CI stated that T, later identified as Moon, drove a brown Ford and provided a phone number to contact him to buy drugs. Id. The CI reported having "bought heroin from 'T' in the past on different occasions." Id.

As a result of the information from the CI, the police began an investigation and arranged a series of controlled buys by the CI. Id. at 2-3. The first of these buys occurred "[w]ithin the last couple of months" [before the February 4, 2011 search warrant application]. Id. at 3. On that

occasion, the police met with the CI and searched the CI for contraband and money.  Id.  The CI then called the phone number he had previously provided for Moon and arranged with the male on the phone to purchase heroin at a location that they arranged during the call.  Id.  The police provided cash for the transaction to the CI and instructed the CI to go to the meet location.  Id.  Police officers followed the CI to that location to conduct surveillance.  Id.  A few minutes later, a brown Ford Taurus, later identified as registered to Sherrica Hendricks ("Hendricks"), Moon's girlfriend, at the 99 Ormond Street address, driven by a person later identified as Moon arrived.  Id.  No one else was in the vehicle.  Id.  After meeting with the CI, the police followed Moon in the brown Ford Taurus to the 99 Ormond Street address where officers observed him enter that location.  Id.  After the meeting with Moon, officers met the CI and the CI gave Detective Ross the drugs he had purchased, which based upon the detective's training and experience, he believed to be heroin.  Id.  The police searched the CI at this time and found no other drugs or money.  Id.  The CI explained that Moon had driven in the car that the police observed and gave him the heroin in exchange for cash.  Id.  Detective Ross knew Moon from a previous arrest for possession with intent to distribute heroin on August 10, 2010 during which Moon was also driving a vehicle registered to Hendricks.  Id.  Accordingly, after this first controlled buy, Detective Ross showed a "sanitized" booking photograph of Moon to the CI who identified Moon as "T" and as the person from which he purchased heroin.  Id. at 4.

The two later controlled buys between the CI and Moon were conducted in much the same manner as the first.  Id. at 4-5.  The second transaction, that occurred "within the last month" [before the February 4, 2011 search warrant application] began with the police's pre-deal search of the CI for contraband and money and the CI calling the same phone number to arrange for the purchase of

heroin.  Id. at 4.  Prior to the CI's meet with Moon, police set up surveillance of the 99 Ormond

Street address.  Officers observed Moon leave that address from the door on the right (Apartment

#1), get into a green Mercedes (a vehicle also later determined to be registered to Hendricks at the

99 Ormond Street address) in the driveway and drive to the location, pre-arranged with the CI on

the phone, to meet with the CI.  Id.  During this meet, the CI also purchased heroin from Moon.  Id.

The third and last controlled buy occurred "[w]ithin the last seventy-two hours" [before the

February 4, 2011 search warrant application].  Id. at 5.  Again on this occasion, after being searched

for contraband and money, the CI called the same phone number to arrange to buy heroin.  Id.

Officers stationed near the 99 Ormond Street address observed Moon leave this address from the

door on the right (Apartment #1) in the same green Mercedes, registered to Hendricks, that he had

used for the second deal and drive to the meet location.  Id.  There, he met with the CI.  Id.  The CI

again purchased a quantity of heroin from him.  Id. at 5-6.

### B.     Moon's Affidavit

Moon has filed an affidavit in which he denies that he sold heroin "to anyone in the Boston

area during the 72 hours leading up to and including February 4, 2011," the date of the search

warrant application.  D. 40-1 at ¶ 6.  He also states that he "was spending most of my time in

Worcester" during the first week of February 2011 and that his vehicle, a green Mercedes, broke

down in Worcester on February 4, 2011 and he had to have it towed.  Id. at ¶¶ 4-5.  He offers records

from the American Automobile Association ("AAA"), evidencing a tow request from Worcester on

the evening of February 4th, in support of this latter claim.  Id.

## IV.    Discussion

### A.     Moon Has Failed to Make a Substantial Preliminary Showing to Warrant a *Franks* Hearing

In support of his motion for a <u>Franks</u> hearing, Moon alleges that there were several material misstatements, including both false statements and material omissions, in the Ross affidavit. Specifically, Moon alleges that: 1) in light of his affidavit denying that he sold any drugs to anyone in the Boston area within the 72 hours before the search warrant application, the last controlled buy recounted in the Ross affidavit did not occur (D. 38 at 7); 2) although the Ross affidavit noted that Moon had a driving license with a mailing address of 99 Ormond Street, Apartment #1, Mattapan, the target location, it failed to reveal that the residential address for Moon's license was 11 Drummond Street, Apartment 3 in Dorchester, an address that did not match the target address (D. 38 at 7-8); and 3) the Ross affidavit refers to a "Boston Police report dated 08/10/2010 involving a motor vehicle accident," when a search of Massachusetts Registry of Motor Vehicles ("RMV") records reveals no such event on that date. (D. 38-1 at 5; D. 38 at 8). In addition, Moon suggests that the vagueness of the affidavit and its striking similarity to other affidavits submitted by Ross compel the need for a <u>Franks</u> hearing in this case. (D. 38 at 11). The Court shall address each of these arguments in turn.

### 1. Controlled Buy in the 72 Hours Before the Search Warrant Application

Moon argues that he has shown that he did not participate in the sale of heroin that occurred in the 72 hours of the warrant application as alleged in the Ross affidavit. He points not only to his own affidavit in which he attests that he did not sell heroin to anyone in the Boston area within this period, but also to the AAA records attached to his affidavit evidencing his request for a tow from Worcester on February 4, 2011. (D. 40-1 at ¶ 6; D. 38-3). As Moon has acknowledged, however, such records do not fully corroborate Moon's claim that he did not sell heroin to anyone in the Boston area within the 72 hours before the search warrant application. The two times listed on the

AAA records from February 4th are 20:29:21 (8:29 p.m.) and 23:29 (11:29 p.m.). (D. 38-3). That is, even in light of these records, the Court cannot conclude that it was impossible for Moon to have sold heroin in the Boston area at some other time on February 4, 2011, even as Moon claimed that he was spending "most of [his] time" Worcester, and there is nothing in these records to suggest that the allegation that Moon participated in such transaction at some point in the 72 hours before the search warrant application on February 4, 2011 is false.

Given the limited probative value of the AAA records, the Court is then left with Moon's affidavit denying that he sold heroin to anyone in the Boston area in the 72 hours before the search warrant application. Such an affidavit is the type of "conclusory, self-serving statement[ ]" that courts have repeatedly concluded does not amount to a substantial preliminary showing warranting a Franks hearing. United States v. Johnson, 580 F.3d 666, 671 (7th Cir. 2009); see United States v. Rosario-Mirando, 537 F. Supp. 2d 299, 303 (D.P.R. 2008). Moon has tried to distinguish this case from Unites States v. Southard, 700 F.2d 1 (1st Cir. 1983). In Southard, defendants submitted affidavits in which they denied making any of the statements attributed to them in the search warrant affidavits in support of their motion for a Franks hearing. Id. at 10. The First Circuit affirmed the denial of the Franks hearing, concluding that the district court's finding that the defendants had failed to make the requisite "substantial preliminary showing." Id. In reaching its conclusion, the court noted that "[a]ll of appellant's allegations are conclusory and unsupported by any offer of proof. By denying flatly that they ever engaged in gambling-related conversations, [the defendants] set up a swearing contest; either they or [the affiant] are lying." Id. This type of swearing contest that the First Circuit disapproved in Southard is the type that Moon proffers here. The fact that he attempts to point to the AAA records as an offer of proof that distinguishes the showing from the one in Southard, that offer of proof does not lend support to the scope of his flat denial of the last

of the three drug transactions.

<blockquote>2. *Failing to Note that Moon's Driver's License Listed a Residential Address in Dorchester*</blockquote>

Moon argues that it was, at a minimum, misleading for Ross to include the fact that Moon's driver's license had a mailing address of the target location, 99 Ormond Street, Apartment #1, Mattapan and exclude the fact that the same license had a different residential address in Dorchester. This argument, however, fails to acknowledge one of the purposes of a search warrant affidavit–to provide a connection between the crime(s) alleged to be committed by a defendant and the evidence of such offenses to be found at the place to be searched, "the so-called 'nexus' element." Ribeiro, 397 F.3d at 49 (citation omitted). After the first controlled buy, police observed Moon arrive back at the 99 Ormond Street residence and enter that location. D. 38-1 at 1. Before the latter two transactions, police observed Moon leave the 99 Ormond Street address from the door on the right for Apartment #1. D. 38-1 at 4-5, 6. During each of these transactions, Moon was driving a vehicle (either the brown Ford Taurus or green Mercedes) registered to his girlfriend, Hendricks, at the 99 Ormond Street address. Id. at 3-4. Moreover, Moon's girlfriend was the utilities subscriber for that apartment and Moon had been the utilities subscriber there prior to September 16, 2010. Id. at 5. In this context, the fact that Moon indicated his intention to receive mail at the same address by listing his mailing address at the 99 Ormond Street address for his driver's license certainly lent further support to a connection between Moon and the target location. The omission of a different residential address associated with Moon's driver license was not material and the Court cannot conclude that such omission was intended to mislead the issuing clerk magistrate as to Moon's connection to the target location.

<blockquote>3. *August 10, 2010 Motor Vehicle Infractions*</blockquote>

In his motion papers, Moon argues that no motor vehicle accident occurred on August 10, 2010. D. 38 at 8. However, even the records from the RMV that Moon attaches to his memorandum indicate that on August 10, 2010, Moon was cited for failure to stop and speeding. D. 38-4. On the same day, as recounted elsewhere in the Ross affidavit, Moon was arrested for possession with intent to distribute a Class A controlled substance (heroin). D. 38-1 at 3. Moon initially points to this latter arrest as evidence that it is unlikely that a motor vehicle accident involving him also occurred that day. D. 38 at 8. However, the BPD report about the arrest that was proffered by Moon's counsel to the Court in connection with the May 8, 2012 motion hearing reveals that he was speeding and failed to stop for a red light before the police stopped and arrested him for the drug charge. 5/8/12 transcript at 13-18 (discussing and referencing BPD report of 8/10/2010 arrest (Bates #230-231)), 47 (citing for the record that the report at Bates #231 recites that "[a]s Moon was followed he was observed to drive 50 to 55 miles per hour on Warren Street and proceed against the red light on Warren Street at MLK Boulevard"). Although the characterization of this incident as a motor vehicle "accident" (as opposed to an incident) could be described as sloppy, the Court does not agree that the inclusion of this information was made with the requisite animus, i.e., a false statement knowing and intentionally, or with reckless disregard for the truth, included in the Ross affidavit. The records from the RMV make clear that Moon was cited for motor vehicle infractions on August 10, 2010 and the BPD report lends support to the conclusion that these infractions arose out of the same circumstances that lead to Moon's arrest that day on drug charges.

Moreover, the significance of the motor vehicle citations was not the circumstances or characterization of the incident, but the fact that on that day, August 10, 2010, Moon was also driving a vehicle registered to his girlfriend, Hendricks, the listed subscriber for utilities at the 99 Ormond Street address. D. 38-1 at 3; 5/8/12 transcript at 18. Accordingly, the Court cannot

conclude that this claim, alone or in conjunction with Moon's arguments, provides a sufficient showing to warrant a <u>Franks</u> hearing.

    *4. Vagueness of the Ross Affidavit and Its Comparison to Other Affidavits Filed by Detective Ross*

  Moon argues that each of claims above, coupled with the "vagueness" of the affidavit and "its striking similarity" to other affidavits filed by Ross in other matters bolsters his showing that a <u>Franks</u> hearing is warranted here. D. 38 at 11. The Court does not agree.

  As to vagueness, Moon points to the lack of detail about the timing of each of the three controlled buys and to inclusion of some boilerplate language. D. 38 at 12-13. As recounted above, the exact timing of each of the controlled buys was not recounted in the Ross affidavit; they were described as having occurred in "last couple of months," "the last month," and within the "last seventy-two hours" before the February 4, 2011 search warrant application, respectively. However, Ross affidavit also includes an explanation about why the affiant did not provide certain details about these controlled buys and the other assistance that the CI provided to the BPD. D. 38-1 at 2. The reasons were three-fold: to protect the CI from harm; the police department's reputation for protecting confidential informants is crucial to the future development of confidential informants; and more information would enable others to build a "pyramid" of information in an attempt to identify the confidential informant, putting his/her safety at risk. <u>Id.</u> at 2-3. With this explanation, coupled with the corroboration of the information provided by the confidential informant, including record checks and police surveillance of the three controlled buys with Moon, <u>United v. Paradis</u>, 802 F.2d 553, 558 (1ˢᵗ Cir. 1986) (relying, in part, on such corroboration in affirming the denial of a <u>Franks</u> hearing and suppression motion), all recounted in the Ross affidavit, the Court does not conclude that the alleged "vagueness" about the date and time of each of the purchases of heroin by

Moon or the CI's previous assistance to the police department lends sufficient support to Moon's showing that a <u>Franks</u> hearing is warranted here. Although an affiant's choice not to include the precise date or time may invite a <u>Franks</u> motion such as this one where none may be warranted, it is far from satisfying the substantial preliminary showing that Moon must make, whether considered alone or in conjunction with his other arguments. <u>See</u> <u>United States v. Davis</u>, 96 F.3d 1430 (1st Cir. 1996) (Table) (noting that "[w]hile further detail about the controlled buy might have been desirable, the lack of specificity about the date of the buy or the quantity involved is not necessarily probative of falsity. . . . concern for keeping the buyer's identity confidential is a more likely explanation for the lack of those details" in its conclusion that such lack of detail, even in conjunction with other allegations, did not amount to the requisite showing for a <u>Franks</u> hearing).[2]

The same can be said for Moon's argument about the striking similarity between the Ross affidavit and other affidavits filed by this detective in other drug cases. In support of his characterization of the Ross affidavit as strikingly similar to those submitted by Detective Ross in other drug cases, Moon has filed the affidavit of Ramou Sarr, a paralegal in the Federal Defender's Office. D. 38-5. This affidavit attaches search warrant affidavits submitted by Ross to the Dorchester and Roxbury District Courts, submitted to the Court as Exhibits D01 to D20. <u>Id.</u> at ¶ 7.[3] Sarr also prepared and attached a summary table of these affidavits, D00. <u>Id.</u> Based upon this comparison, Moon alleges that the striking similarities include references to a confidential informant having provided the BPD with reliable information that has led to the arrest(s) of individual(s) for

---

[2]Additionally, there is no suggestion or allegation that the CI here is fictitious, distinguishing this case from <u>Commonwealth v. Ramirez</u>, 416 Mass. 41, 50 (1993) and <u>Commonwealth v. Lewin</u>, 405 Mass. 566, 582 (1989), two cases offered by Moon that address <u>Franks</u> in the context of search warrant affidavits that relied upon a nonexistent informant.

[3]Exhibit D19 is actually the Ross affidavit at issue in this case.

violation of the drug laws and also the seizure of drugs and money, but provides no further detail about the informant's reliability; each affidavit recites two to four controlled buys, with most involving three such buys, but no specific date or time; if the controlled buys did not occur at the target location to be searched, the location is not included; and Ross does not conduct any field test of the contraband or otherwise corroborate his observation that the substance purchased by a CI is a controlled substance. Id. at ¶¶ 8-11. But there are some differences between the Ross affidavit and others proffered, including but not limited to the number of controlled buys (which Moon acknowledges); the means of identifying the defendant (or failing to do so by his true name) (D. 38-6 at 5, 37-38; D. 38-7 at 22; D. 38-8 at 7); observation of another drug customer at the target location (D. 38-6 at 75); observation of attempted disposal of drugs at the target location (D. 38-7 at 14); involvement of multiple informants or tipsters (D. 38-7 at 8-9; D. 38-8 at 44-45); and the affiant's knowledge of the target location from previous drug investigations (D. 38-7 at 80). More significantly, similarity in the description of a confidential informant's past assistance to the BPD (so as not to reveal his/her identity), the description of the ways in which a particular drug transaction was a "controlled buy" and the fact that Detective Ross does not routinely conduct field tests of controlled substances reflect his police training and methods of conducting investigations and do not suggest that the Ross affidavit contains false statements. United States v. Dixon, No. 11-10218-JLT, 2012 WL 1859264, at *5 & n. 44 (D. Mass. May 21, 2012) and cases cited.

Accordingly, the Court concludes that Moon has failed to make the substantial preliminary showing that the allegedly false statements were knowingly, intentionally or recklessly included in the affidavit. Since Moon has failed to satisfy the first prong of the requisite showing for a Franks hearing, the Court need not reach whether he also failed to make the further showing that even putting the statements cited above to one side, there is no probable cause for the search warrant.

See, e.g., United States v. Ortiz, 988 F.2d 124 at n. 1 (9th Cir. 1993) (Table); United States v. Goldenberg, No. 05-1034-DC, 2006 WL 266564, at *6 (S.D.N.Y. February 3, 2006).

However, even if the Court had accepted his argument that he satisfied the first prong of the Franks showing and put aside the evidence of the omission of his driver's license listing a residential address in Dorchester, characterizing the August 10, 2010 motor vehicle infractions as a "motor vehicle accident," even when coupled with "vagueness" about the controlled buys and the CI's involvement in past assistance to the BPD and striking similarity between affidavits submitted by this detective, the Court still concludes that the Ross affidavit contained probable cause for the search warrant. In the absence of such information, there was still sufficient information about Moon's three sales of heroin, observation of him entering or existing the target location before/after the controlled buys and sufficient information about Moon's connection to the target location either directly or through his connection to Hendricks.

Whether there would still be probable cause for the search warrant if the Court also accepted Moon's argument that the last buy, within 72 hours of the search warrant application, did not occur is a closer question. Whether reliance on the two earlier transactions, the last of which occurred in the month before the search warrant application would be too stale to support a search warrant for the 99 Ormond Street address is at least debatable, but the First Circuit has affirmed a finding of probable cause in drug trafficking cases involving controlled buys that last occurred a number of months before a search warrant application. See, e.g., United States v. Feliz, 182 F.3d 82, 87 (D. Mass. 1999) (citing other cases in which probable cause determination were upheld for drug trafficking cases involving "similar [approximately three months prior to issuance of a search warrant] or even longer periods of time"). So, even if this Court had to reach the second prong of the Franks showing and put the last controlled buy to one side along with the other evidence above

that Moon challenges, that would not negate the probable cause for the search warrant in this case.

**B.**     **There was Probable Cause for the Search Warrant**

The Ross affidavit sets forth sufficient facts to support a finding of probable cause. The affidavit recounted that Detective Ross, a seventeen-year veteran of the BPD who has been assigned to the BPD Drug Control Unit since 2001, had extensive training and experience in the investigation of drug crimes. D. 38-1 at 1-2. Although the investigation in this case began with information from a CI, who had previously provided reliable information to the BPD, Detective Ross corroborated the substance of the information provided by the CI through further investigation and the conduct of three controlled buys with Moon.

*1.*     *Information from the CI*

This is not a case in which the probable cause for the search warrant rested upon CI information alone. Even so, the affidavit provided sufficient information in which the clerk magistrate could assess the credibility of the CI information. United States v. Greenburg, 410 F.3d 63, 67 (1st Cir. 2005) (noting that factors to consider in assessing CI information for a search warrant includes the CI's veracity or basis of knowledge; whether the CI's statements are "self authenticating"; whether some or all of the CI's statements were "corroborated wherever reasonable and practicable"; and whether the police affiant "included a professional assessment of the facts related by the informant based in experience") (internal quotation omitted). The Ross affidavit clearly noted that the CI's basis of knowledge of Moon (or "T" as he was initially known to the CI) was his heroin transactions with him in the past. The CI had provided reliable information in the past to the BPD Unit in which Detective Ross works and the specific details that the CI provided about Moon including his description, his use of a brown Ford and a specific phone number.

Although the details of the CI's past assistance to the police were not provided, the Ross

affidavit did note that the CI's past assistance had been productive (i.e., having led to the arrests and convictions and seizure of contraband) and explained that the reason no further information was provided was in the legitimate interest of protecting the CI's identity. D. 38-1 at 2. Most significantly, the CI's information in large measure was corroborated by the independent investigation conducted by the police. See United States v. Tiem Trinh, 665 F.3d 1, 10-12 (1st Cir. 2011); Paradis, 802 F.2d at 557-58; Greenberg, 410 F.3d at 69; cf. United States v. Vigeant, 176 F.3d 565, 569-70 (1st Cir. 1999) (finding no probable cause for a search warrant where information about at least one drug transaction two years before application and six months before alleged suspicious financial transactions and such information was provided by an informant whose reliability and credibility were not supported or referred to in the affidavit, contained no "self-authenticating" details and there was no independent corroboration of that information). Police observed Moon in a brown Ford, later confirmed to be registered to his girlfriend, during the first controlled buy; the CI called the phone number he had provided as "T's" when arranged each of the three buys with Moon; and the police observed Moon during each of those buys and the CI identified "T" as Moon when the police showed him a photo of Moon after the first controlled buy.

### 2.    *Controlled Buys*

Moon concedes that the absence of information about the CI's reliability may not be fatal where there is independent corroboration of the CI's information, D. 38 at 16 (citing United States v. Khounsavanh, 113 F.3d 279, 286-87 (1st Cir. 1997)). The Court, however, disagrees with Moon's further argument that the controlled buys here were insufficient independent corroboration because the police officers themselves did not observe the actual exchanges of money for drugs between the CI and Moon. Such argument understates the significant ways in which the police "controlled" each of the heroin purchases from Moon. The Ross affidavit makes clear the ways in which the police

were closely monitoring the CI's role in each of these three deals–they met with the CI, who was searched and found to be free of contraband or money; the CI dialed the number he had previously identified as "T's" to arrange purchase of heroin; the police provided the CI in buy money; the CI went to meet location while officers went to the same location to observe the transaction; Moon arrived alone, in one of two vehicles registered to his girlfriend; the CI and Moon were observed in a brief conversation; and the police then followed the CI back to a pre-arranged location where the CI handed over the heroin and was searched and found otherwise to be free of drugs and money. In the subsequent meeting with the police, the CI explained that during the meet, Moon had given him the heroin in exchange for the buy money the police had provided. Such tight surveillance and control of the sales was sufficient corroboration for the CI information even if every detail of the CI information was not corroborated. See Khounsavanh, 113 F.3d at 285-86.

### 3. Nexus with the 99 Ormond Street address

There was also, contrary to Moon's argument, sufficient nexus between Moon's drug crimes and the 99 Ormond Street address, the target location. After the first controlled sale, the police tailed Moon to this residence. D. 38-1 at 3. Before both the second and third controlled sales, police observed Moon leave the 99 Ormond Street address, enter a green Mercedes registered to his girlfriend at that address, and drive to the meet location for the pre-arranged drug sale to the CI. D. 38-1 at 4-5. Moreover, further police investigation revealed that Moon had been the subscriber for utilities at this address before September 16, 2010 and listed this address as his mailing address for his driver's license. D. 38-1 at 4-5. Further, he used two vehicles, each of which was registered to Hendricks (revealed as his girlfriend in a BPD report) during these transactions. Hendricks not only had the vehicles registered in her name at the 99 Ormond Street address, but was the current subscriber for utilities at that address. D. 38-1 at 3-5. Although there was no information in the

affidavit regarding the quantities of heroin that Moon trafficked during the controlled buys (or in his prior sales to the CI), the succession of such buys and the officers' surveillance of Moon leaving the residence for the meet site or returning to the residence immediately after the deal leads to a reasonable inference that Moon was storing heroin and/or drug proceeds at this location.  <u>See</u> <u>Rosario-Mirando</u>, 537 F. Supp. 2d at 303 (noting that the First Circuit "has repeatedly found that when a defendant sells drugs outside his home, it is reasonable to conclude that there is evidence of his drug dealing activity in the home, particularly when the defendant is observed leaving the home immediately prior to selling drugs") <u>and cases cited</u>.  Based upon these facts and circumstances, there was more than sufficient nexus between Moon's criminal conduct and the target location.

### 4. *Identification of Heroin*

Although Moon notes that some courts have ruled that a field test is not required for a probable cause showing, his argument as to the absence of such tests here suggests he believes that such an investigative step should be mandatory.  D. 38 at 21. A field test of items suspected to be controlled substances may be prudent practice in some circumstances, however, it is but one of several investigatory steps that the police can take to identify drugs.  Here, Detective Ross observed the items in question and, based upon his extensive training and experience as a police officer engaged in drug investigations, concluded that they were heroin.  The Ross affidavit recites the detective's training and experience including but not limited to his years working in the BPD Drug Control Unit and courses in drug detection and identification.  D. 38-1 at 1.  Moreover, he did not make this observation or reach this conclusion in a vacuum.  It came in the context of three controlled buys in which the CI had negotiated the sale of heroin.  There is nothing about these circumstances to suggest that a field test  should be required for the purposes of probable cause and the Court declines Moon's invitation to suggest as much.

For all of these reasons, the Court finds that there was probable cause for the search warrant and denies Moon's motion to suppress.[4]

## C.    In the Absence of *Franks* Hearing, Ordering of Further Discovery Under Local Rule 116.2(b)(1)(B) is Not Warranted

Moon also renews a motion for discovery that the magistrate judge (Sorokin, Chief M.J.) previously denied without prejudice to renew in connection with the <u>Franks</u> motion and motion to suppress that is now before this Court.  D. 32.  Specifically, Moon seeks "all information" about Ross about whether he has been the subject of police internal affairs investigations, disciplinary action or criminal investigation, "any of which were for conduct involving false statements, perjury, obstruction of justice, receipt of gratuities or violation of rights of a criminal suspect or defendant." D. 39 at 2.  Moon also seeks the exact dates and times of the three controlled buys described in the Ross affidavit, D. 39 at 5, and information that casts doubt upon the reliability and veracity of the CI, including but not limited to all promises, rewards and inducements given to the CI by law enforcement; his/her criminal record and information about his/her history of drug/alcohol use and mental illness.  D. 39 at 8.  Since Moon's position is that the Court should allow its renewed discovery even if it denies his motion for a <u>Franks</u> hearing, the Court will address this motion in light of its denial of that motion.

### 1.    *Discovery Regarding Detective Ross*

Moon's motion seeks certain information regarding Detective Ross that he contends bears upon the officer's credibility as a witness and constitutes exculpatory evidence. D. 39 at 3; <u>see</u> <u>Giglio</u>, 405 U.S. at 154-55.  The government does not necessarily dispute that if the Court granted

---

[4]Since the Court finds that the search warrant was supported by probable cause, the application of the good faith exception to the search warrant under <u>United States v. Leon</u>, 468 U.S. 897 (1984) is unnecessary.  <u>Dixon</u>, 2012 WL 1859264, at *7.

the <u>Franks</u> motion and the government called Moon as a witness, Moon would be entitled to the category of <u>Giglio</u> information nor that such category of information must be produced twenty-one days before trial if the government anticipates calling Ross as a witness in its case-in-chief at trial. D. 39 at 3; Local Rule 116.2(b)(2)(A).  The government, however, does dispute that such information is required to be produced under Local Rule 116.2(b)(1)(B), as Moon argues here, as evidence that cast doubt on the admissibility of evidence that the government plans to introduce in its case-in-chief that might be subject to a motion to suppress or exclude.

At least in the circumstances of this case, it is not clear that such information would cast doubt on the admissibility of evidence in this case or would, as Moon suggests, give support to his <u>Franks</u> motion.  As discussed above, the law requires a defendant to make a substantial preliminary showing about the inclusion of false statements in the affidavit to overcome the presumptive validity of a search warrant and get a <u>Franks</u> hearing. The evidence sought about Detective Ross does not bear upon false statements in this affidavit or this matter, but a broad array of disciplinary actions, unbounded by any time frame, in which Detective Ross was "the subject" of such investigation. Even if such evidence (or some subset of same) would be required to be disclosed if the detective was called as a witness and might be fair game for cross examination of Detective Ross, it does not lend credence to Moon's motion for a <u>Franks</u> hearing and does not cast doubt on the admissibility of the evidence that such motion sought to suppress.[5]

---

[5]The Court does agree that the provisions of Local Rule 116.2(b)(1), like the other provisions of automatic disclosures required by the government under the Local Rules, are self-executing.  However, regardless of what showing Moon claims to have made here (which fell short of the showing required for a <u>Franks</u> hearing), the Court does not agree that this category of information in this case–information about Detective Ross having been the subject of internal investigations or criminal investigations–falls under Local Rule 116.2(b)(1)(B) or is otherwise constitutionally required to be produced by the government at this juncture.  To the extent that the original order or the order upon motion for reconsideration in <u>U.S. v. Smith</u>, Crim. No. 02-

*2.      Exact Dates/Times of the Controlled Buys*

Similarly, the Court cannot agree with Moon that disclosure of the exact dates and times of the controlled buys are required under Local Rule 116.2(b)(1)(B).  Such discovery does not in and of itself bear upon the admissibility of the evidence of the search, Moon's motion to suppress evidence or even Moon's motion for a <u>Franks</u> hearing.  The government notes that the exact dates and times would serve to identify the CI.  To rule otherwise would undermine the high standard set under <u>Franks</u>.  Having ruled that Moon's self-serving declaration denying participation in the third controlled buy is insufficient to make his substantial preliminary showing for a <u>Franks</u> hearing, it seems inconsistent to conclude that the same declaration could serve to compel disclosure of the exact dates and times to refute Moon's denial of the third controlled buy.  Moreover, to the extent that Moon argues that his discovery motion is related to his <u>Franks</u> motion, this portion of the motion seems overbroad since even his affidavit does not dispute the first and second controlled buys in the context of that motion.

*3. Information about the CI*

Finally, the Court also denies the discovery motion as to the information sought about the CI.  Even in the context of a <u>Franks</u> hearing, if such had been granted here, the veracity of the affiant's statements (or those of other officers), not a confidential informant, is at issue.  <u>D'Andrea</u>, 648 F.3d at 13; <u>cf.</u> <u>Smith</u>, Crim. No. 02-10067-NG, Docket No. 81 (reversing earlier order requiring production of certain impeachment information about CI and limiting such production to information that the police affiant knew or should have known).   Although the information sought about the CI

_____

10067-NG, Docket No. 54 (D. Mass. Jan. 17, 2003) and 81 (D. Mass. Jan. 29, 2004) suggest otherwise, the Court declines to follow them.

would most likely be discoverable under the Local Rules if the government anticipated calling the CI as a witness in its case-in-chief, Local Rule 116.2(b)(1)(C)-(E), 116.2(b)(2)(A)-(G), such is not the case here. Moreover, the clerk magistrate reviewing this search warrant affidavit was not mislead about the CI's background or the illegal manner in which he had previously interacted with Moon (namely, by purchasing heroin from him in the past). That is, while the details of the CI's criminal record or any drug use were not provided, the clerk magistrate was "on notice that the 'confidential informant was not a model citizen' and that he had previously violated laws." United States v. Jordan, No. 09-10139-JLT, 2010 WL 625280, at *5 (D. Mass. February 23, 2010) (quoting United States v. Avery, 295 F.3d 1158, 1168 (10th Cir. 2002)).[6] That is, "it is improbable that a specific recitation of the confidential informant's criminal history would have influenced the magistrate['s] . . . decision-making process or assessment of the informant's veracity." Avery, 295 F.3d at 1168. **V.    Conclusion**

For the foregoing reasons, Moon's motion for a Franks hearing and to suppress evidence seized on February 6, 2011 is DENIED and his motion for discovery is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge

---

[6]The same cannot be said where, unlike in this case, a search warrant depended solely upon information from an informant of "untested reliability" and with "weak police corroboration." United States v. Simmons, 771 F. Supp. 2d 908, 917-920 (N.D. Ill. 2011).